# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

**Civil Action No. 3:14-CV-607-GCM-DCK**

| | |
|---|---|
| **JAFRUM INTERNATIONAL, INC.,**<br><br>**Third Party Plaintiff,**<br><br>v.<br><br>**CONSOLIDATED MARKETING GROUP, INC. d/b/a CHARLOTTE INSURANCE,**<br><br>**Third Party Defendant.** | **BRIEF IN SUPPORT OF THIRD PARTY DEFENDANT CONSOLIDATED MARKETING GROUP d/b/a CHARLOTTE INSURANCE'S MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Rule 7.1(C) of the Local Rules Governing Civil Cases for the United States District Court for the Western District of North Carolina and Rule 56 of the Federal Rules of Civil Procedure, Third Party Defendant Consolidated Marketing Group d/b/a Charlotte Insurance (hereinafter "Charlotte Insurance"), by and through undersigned counsel, hereby submits this brief in support of its Motion for Summary Judgment (Doc. 74).

### SUMMARY OF ARGUMENT

Jafrum alleges that Charlotte Insurance failed to obtain trademark infringement coverage despite its instruction to do so. However, the facts developed in this case disclose that Jafrum's failure to thoroughly read the clear and unambiguous language in the policies caused any confusion over coverage. Jafrum had a duty to fully read its CGL insurance policies and to take curative action once it discovered any alleged defect in coverage. As a result, Jafrum never realized over the course of nearly a decade—predating its business relationship with Charlotte Insurance—that it never had trademark infringement coverage.

The breach of fiduciary duty claim against Charlotte Insurance is time-barred, though even if it is not, Charlotte Insurance satisfied its fiduciary duty to Jafrum. Charlotte Insurance procured the policies that Jafrum ultimately requested and had no legal duty to understand that Jafrum 'needed' trademark infringement coverage from the prior claims history described to it in initial meetings between the two companies.

## FACTUAL BACKGROUND

The following fact statement is cast below in a light most favorable to the nonmoving party and contains only material facts on record, in accordance with the relevant summary judgment standard.

### A. State Farm declined to renew Jafrum's CGL policy.

In 2009, citing a prolific claims history, State Farm Mutual Insurance (hereinafter "State Farm") ended its seven-year business relationship with Jafrum, declining to renew its comprehensive general liability ("CGL") policy. See, Deposition of Jaffer Sait Mohammed, 39:18-41:11 (September 5, 2017) [hereinafter "Exhibit A"] (*e.g.*, "…[T]hey [*i.e.*, State Farm] said [State Farm] could not insure me again because of the lawsuits we had.");[1] *see also*, id., 94:1-10, 119:4-8.[2] In and before 2009, Jafrum paid $2,000 to $2,300 in premiums per year to State Farm for CGL coverage. Id., 41:4-5.

### B. Jafrum and Charlotte Insurance engaged in communications about insurance needs in 2009 and early 2010.

At Mr. Mohammed's request, a State Farm representative recommended Charlotte Insurance as an insurance agency that could assist him in obtaining new CGL coverage in 2010.

---

[1] Mr. Mohammed is the president and CEO of Jafrum. Exhibit A, 7:23-25.

[2] In addition to having his deposition taken in his individual capacity, Mr. Mohammed was also designated by Jafrum as its designee to testify on its behalf in accordance with Fed. R. Civ. P. 30(b)(6). The organizational deposition was taken immediately after Mr. Mohammed's individual deposition and appear as one deposition transcript in the record. The organizational deposition begins at Exhibit A, 67:18 and continues to the conclusion of the transcript.

Exhibit A, 40:25-41:11. Mr. Mohammed called Charlotte Insurance and was connected with an agent named Markos Keller by happenstance. Id., 41:14-17. From late 2009 until 2012, Mr. Keller was Jafrum's principal contact at Charlotte Insurance. Id., 42:24-43:1.

Mr. Mohammed claims that he requested trademark infringement coverage in conversations with Charlotte Insurance in 2009 and early 2010. Exhibit A, 41:5-11, 64:12-23, 147:21-148:1. However, he "didn't ask [Charlotte Insurance] to go and procure trademark and then procure copyright and then procure liability and then procure this," but rather he explained Jafrum's prior claim history, which included a trademark infringement suit, and that he needed those types of claims to continue to be covered. Id., 42:19-23; 61:23-25; 97:25-98:25; 131:18-24.

Jafrum never experienced any issues with State Farm denying coverage. Exhibit A, 40:19-21. State Farm undertook the defense of a lawsuit involving, *inter alia*, allegations of trademark infringement. Id., 39:18-40:21; 84:25-85:13. Thus, Mr. Mohammed believed he must have had trademark infringement coverage from State Farm. Id. Mr. Mohammed was wrong. Jafrum's CGL policy through State Farm did not provide such coverage. See, Mohammed Depo, Ex. 4 [hereinafter "Exhibit B"], p. 28 of policy. Mr. Mohammed never read any of the Jafrum policies issued by State Farm, preferring to simply "scan through things…". Exhibit A, 83:22-84:8.

At first, Mr. Mohammed had reservations about Mr. Keller's competence, so Charlotte Insurance President Marty Karriker attended at least one meeting with Mr. Mohammed and Mr. Keller. See, Exhibit A, 41:18-45:11. After several meetings, Charlotte Insurance obtained CGL coverage from Catlin Insurance for Jafrum, effective February 12, 2010. See, e.g., id., 51:12-23. (See also, Doc. 3, p. 7, ¶ 4.) Jafrum claims that it did not receive a copy of the Catlin policy at

PPAB 4135279v1

that time, and did not until the commencement of this action.  Id., 115:12-116:11. The Catlin policy unambiguously excluded trademark infringement coverage.  (Doc. 65, pp. 4, 9-15.)

### C. Catlin declined to renew its policy and Jafrum sought premium reduction for the same coverage.

As the Catlin policy-year neared its end, Mr. Mohammed asked Charlotte Insurance to inquire into obtaining "better insurance at a better price," with "all included." <u>See</u>, Mohammed Depo., Ex. 8. [hereinafter "<u>Exhibit C</u>"]  Mr. Mohammed wanted the same coverage that Jafrum had with Catlin, but at a less expensive premium.  Exhibit A, 131:8-132:8.  In the meantime, Catlin informed Charlotte Insurance that it would not be renewing Jafrum's policy because Catlin was unwilling to continue to insure motorcycle helmets.  Id., 129:14-15.

On February 10, 2011, in an email exchange with Mr. Karriker and Mr. Keller, Mr. Mohammed asked that Charlotte Insurance "keep the current policy without any change and please find from Hartford [*i.e.*, the parent company of Sentinel Insurance] clearly whether they will insure Product-Completed/Operations, Copyright, Patents, Trademarks, Advertising Injuries etc."  Mohammed Depo., Ex. 9 [hereinafter "<u>Exhibit D</u>"].

During this time, Jafrum explored the possibility of placing its logo on motorcycle helmets that it sold.  On February 10, 2011, Mr. Keller explained to Mr. Mohammed that "Hartford will not want to insure your company for products when your company is putting Jafrum International on the labels of motorcycle helmets." Exhibit D.  As a result, Charlotte Insurance approached a broker in the secondary insurance market about obtaining this products coverage on Jafrum's behalf.  Deposition of Markos Keller, 11:13-12:21 (December 14, 2017)[3].

Thereafter, Charlotte Insurance received an 'indication'—*i.e.*, a preliminary quote—of an

---

[3] This excerpt of  Mr. Keller's deposition is contained in the "Appendix of Exhibits to Brief in Support of Third-Party Plaintiff Jafrum International Inc.'s Motion for Summary Judgment on Breach of Fiduciary Duty Claim," Exhibit A. (Doc. 72-2, pp. 12-13.)

4

annual premium for the product liability coverage from Evanston Insurance Company of $25,000. See, Mohammed Depo, Ex. 10 [hereinafter "Exhibit E"]. Mr. Keller communicated this information to Mr. Mohammed, who promptly replied that he was abandoning his plans to place Jafrum's brand on the helmets.  Id.  In that same e-mail correspondence, Mr. Mohammed also stated that Jafrum could not pay more than $5,000-$6,000 in insurance premiums at that time. Id.

As a result of Catlin's nonrenewal decision, Charlotte Insurance obtained CGL coverage from Sentinel Insurance for Jafrum, effective March 12, 2011 for approximately $6,500.  See, Exhibit A, 142:12-14, and Mohammed Depo. Ex. 11 [hereinafter "Exhibit F"].  (This policy is hereinafter referred to as "the 2011 Sentinel Policy.")  The 2011 Sentinel Policy was delivered to Jafrum on or around March 21, 2011.  Id., see also, Exhibit A, 143:18-144:5.  The cover letter sent by Charlotte Insurance to Jafrum with the 2011 Sentinel Policy stated, "please take some time to become aware of the coverages afforded by your policy."  Exhibit F.    However, Mr. Mohammed did not "review the whole policy" on Jafrum's behalf, but rather "went through the policy," as he had with his State Farm policies, and did not spot any issues.  Exhibit A, 145:20:25.

### D.  The Sentinel Policy was renewed in 2012.

The Sentinel Insurance policy was renewed on March 12, 2012.  Exhibit A, 146:25-147:15, and Mohammed Depo Ex. 12 [hereinafter "Exhibit G"].  (This renewal is hereinafter referred to as "the 2012 Sentinel Renewal," and when referred to collectively with the 2011 Sentinel Policy are referred to as "the Sentinel Policies.")  The 2012 Sentinel Renewal was delivered to Jafrum on or around January 30, 2012.  Id.  Again, as has already been determined

PPAB 4135279v1

in these proceedings, the Sentinel Policies unambiguously excluded trademark infringement coverage. (Doc. 65, pp. 6, 16.)

**E. Helmet Venture sues Jafrum for trademark infringement in 2014.**

On February 21, 2014, Helmet Venture, Inc. filed a lawsuit in U.S. District Court for the Central District of California, Case No. 2:14-CV-1307, against Jafrum alleging trademark infringement from 2009 and onward, thus implicating the coverage periods for the Catlin and Sentinel policies. (See, Doc. 65, pp. 2-4.[4]) Jafrum subsequently filed a lawsuit in this Court, Case No. 3:14-CV-566, against Helmet Venture, Inc., wherein Helmet Venture alleged trademark infringement as counterclaims.

## RELEVANT PROCEDURAL HISTORY

On October 30, 2014, the original complaint was filed under this caption by Catlin, seeking declaratory relief related to whether it, under the terms of its CGL policy, owed a defense to Jafrum in the aforementioned Helmet Venture litigation in the U.S. District Court for the Central District of California.

In its responsive pleading dated November 18, 2014, Jafrum answered Catlin's allegations and counterclaimed against Catlin, while also filing a Third-Party Complaint against Sentinel Insurance and Charlotte Insurance. Jafrum's counterclaim against Catlin and the third-party claim against Sentinel contended that the insurers owed Jafrum a defense in the California litigation filed by Helmet Venture. (Doc. 3, pp. 7-9, ¶¶ 4-16 as to Catlin; Doc. 3, pp. 9-12, ¶¶ 1-17 as to Sentinel.) In the alternative, Jafrum alleged in its initial Third Party Complaint that Charlotte Insurance negligently failed to procure trademark infringement insurance "[a]t the

---

[4] Charlotte Insurance incorporates the detail of the underlying dispute between Helmet Venture, Inc. and Jafrum contained in the Court's Order dated January 19, 2017, cited herein at Doc. 65, pp. 2-4.

PPAB 4135279v1

times Charlotte Insurance procured the Catlin Policy and the Sentinel Policy…" (Doc. 3, p. 21, ¶ 21.)  Subsequently, Charlotte Insurance filed a motion for judgment on the pleadings arguing that Jafrum's claims were time-barred.  (Doc. 26, p. 5.)  In response, Jafrum filed the Second Amended Third-Party Complaint alleging that Charlotte Insurance acted negligently and/or breached its fiduciary duty by failing to procure trademark infringement coverage each of the years it procured policies for Jafrum, "including all renewals thereof."  (Doc. 38, p. 5, ¶ 21.)

On April 18, 2016, Catlin filed a motion for summary judgment (Doc. 53), while Sentinel and Charlotte Insurance filed contemporaneous motions for judgment on the pleadings (Docs. 49, 51).  On January 19, 2017, the Court entered an Order holding the following:

  i.   None of the factual allegations pled in the complaint filed by Helmet Ventures in the U.S. District for the Central District of California could be "extricated from its trademark infringement allegations" (Doc. 65, p. 12);

  ii.  The Catlin policy effective February 12, 2010 (hereinafter "the 2010 Catlin Policy") unambiguously excluded trademark infringement coverage through its intellectual property exclusion (Doc. 65, pp. 4, 9-15) and thus Catlin prevailed as a matter of law on its declaratory judgment claim;

  iii. The Sentinel Policies effective March 12, 2011 and March 12, 2012 unambiguously excluded trademark infringement coverage through the exclusion labeled "personal and advertising injury" (Doc. 65, pp. 6, 16), and thus, Sentinel prevailed as a matter of law on Jafrum's declaratory judgment claim;

  iv.  Jafrum's negligence claim against Charlotte Insurance is time-barred by N.C. Gen. Stat. § 1-52(5) **as it pertains to the 2010 Catlin Policy and the 2011 Sentinel Policy** because "the alleged wrong giving rise to the right to bring the

7

negligence claim is Charlotte Insurance's failure to procure **the requested** trademark infringement coverage," and those dates of procurement fall outside three years from the filing of the Third Party Complaint (Doc. 65, pp. 17-18) (emphasis added); and

v. Jafrum's breach of fiduciary duty claim against Charlotte Insurance survived the Rule 12(c) statute of limitations analysis because further factual development was required to determine when Jafrum "discovered, or ought to have discovered, through reasonable diligence that its insurance policies did not include coverage for trademark infringement" (Doc. 65, pp. 18-19.)

As will be discussed below, now that the discovery phase has concluded, the factual development in this matter discloses that Charlotte Insurance is entitled to summary judgment as to the remaining claims: (i) the negligence claim, pertaining to the 2012 Sentinel Renewal; and (ii) the breach of fiduciary duty claim as it arises out of the 2010 Catlin Policy and the Sentinel Policies.

**ARGUMENT**

## I. CHARLOTTE INSURANCE IS ENTITLED TO SUMMARY JUDGMENT ON WHAT REMAINS OF THE NEGLIGENCE CLAIM.

In its Order related to Charlotte Insurance's Motion for Judgment on the Pleadings, the Court noted that "Jafrum's negligence claim against Charlotte Insurance is governed by the three-year statute of limitations set forth in N.C. Gen. Stat. § 1-52(5)." (Doc. 65, p. 17.) The Court concluded that the accrual for negligence claims begins "when the wrong giving rise to the right to bring suit commenced…" Id., see also, *Birtha v. Stonemar, North Carolina, LLC*, 727 S.E.2d 1, 7 (N.C. Ct. App. 2012). "Here, the alleged wrong giving rise to the right to bring the negligence claim is Charlotte Insurance's failure to procure the requested trademark insurance

8

coverage…" (Doc. 65, p. 17.)  Given that the effective dates for the 2010 Catlin Policy and 2011 Sentinel Policy fell outside the three-year statute of limitations, any negligence claim based thereupon had to be dismissed. (Id., p. 18.)

### A. Jafrum never requested that Charlotte Insurance procure trademark infringement insurance for the 2012 Sentinel Renewal.

The only portion of Jafrum's negligence claim to survive the Court's Order on Charlotte Insurance's Motion for Judgment on the Pleadings is that portion arising out of the 2012 Sentinel Renewal.  The only allegation in the negligence claim is that Charlotte Insurance failed to procure insurance that Jafrum specifically requested.  In pertinent part, Jafrum's Second Amended Third Party Complaint alleges that:

> At or around the times Charlotte Insurance procured the Catlin Policy and the Sentinel Policy, **including all renewals thereof**, Jafrum informed Markos Keller… of Jafrum's need for insurance covering, among other things, claims related to trademark infringement, and requested that any insurance procured by Charlotte Insurance include such coverage. (Doc. 38, p. 5, ¶ 21.) (Emphasis added.)

The uncontroverted facts developed in discovery belie Jafrum's allegation.  By its own admission, Jafrum did not request trademark infringement coverage from Charlotte Insurance after 2011.  <u>See</u>, Exhibit A, 147:21-148:1, 156:23-158:15.  The 2011 Sentinel Policy became effective, on March 12, 2011.  <u>See</u>, Exhibit F.  An insurance agent's duty to procure specific insurance coverage only arises if the insured makes a request to the agent.  <u>See</u>, *Baggett v. Summerlin Ins. & Reality, Inc.*, 143 N.C. App. 43, 50, 545 S.E.2d 462, 467 (2001) (Tyson, J., dissenting), <u>rev'd for reasons stated in the dissent</u>, 354 N.C. 347, 554 S.E.2d 336 (2001).  A duty to procure trademark infringement insurance did not arise as it pertains to the 2012 Sentinel Renewal.  Charlotte Insurance could not breach a duty that never existed and, therefore, it is entitled to summary judgment on the negligence claim brought by Jafrum.

9

**B. Jafrum's failure to read the 2011 Sentinel Policy is contributory negligence as a matter of law.**

Even if Charlotte Insurance is determined to have breached its duty to procure trademark infringement coverage for Jafrum in 2012—despite the absence of a 2012 request, Charlotte Insurance is still entitled to judgment based on Jafrum's contributory negligence. Mr. Mohammed did not fully review the insurance policies sent to Jafrum by either State Farm or Charlotte Insurance over the years. <u>See</u>, Exhibit A, 83:22-84:8, 143:18-144:2. Mr. Mohammed testified that his practice with Jafrum's insurance policies was to "just scan through things… I just scan through this and try to… pick up on anything if I can pick up, but I don't read the whole policy…" Id., 83:22-84:8.

Charlotte Insurance delivered the 2011 Sentinel Policy to Jafrum on or around March 21, 2011. <u>See</u>, Exhibit A, 143:18-144:2; <u>Exhibit F</u>. Mr. Mohammed did not "review the whole policy" on Jafrum's behalf, claiming that "it's attorney language" and the "policy was thick," but rather, he "went through the policy," and did not spot any issues during his cursory review. Id., 145:20:25.

> Where a party has reasonable opportunity to read the instrument in question, and the language of the instrument is clear, unambiguous, and easily understood, failure to read the instrument bars that party from asserting its belief that the policy contained provisions that it does not.

*Baggett*, 545 S.E.2d 462, 468-69. Failure of an insured to read an insurance policy is negligence and "knowledge of the contents [of the policy] will be imputed to him…" *Elam v. Smithdeal Realty & Ins. Co.*, 182 N.C. 599, 603, 109 S.E. 632, 634 (1921).

The Court has already determined that the policy language at issue was clear and unambiguous. (Doc. 65, *generally*, pp. 4-6, 8-16; *e.g.*, p. 12, "allegations of trademark infringement clearly fall within the language of the policy exclusion.") The Court noted that the relevant portions of the Sentinel Policies did not provide coverage for "injuries 'arising out of

any intellectual property rights such as copyright, patent, **trademark**…" (Doc. 65, p. 6.) (Emphasis added.)

Therefore, if Mr. Mohammed had read the entire 2011 Sentinel Policy, he would have discovered that the Sentinel Policy clearly and unambiguously excluded trademark infringement coverage and that, likewise, so did the 2012 Sentinel Renewal. As such, Jafrum's failure to read the 2011 Sentinel Policy was negligence as a matter of law. Alternatively, if Mr. Mohammed happened upon the exclusionary language during a "scan" of the 2011 Sentinel Policy, then Jafrum's contributory negligence is even clearer given the failure to request such coverage after delivery of that policy. Thus, the negligence claim against Charlotte Insurance for its failure to procure trademark infringement coverage in the renewal of the original Sentinel Policy is barred under the doctrine of contributory negligence.

## II.   CHARLOTTE INSURANCE IS ENTITLED TO SUMMARY JUDGMENT ON THE BREACH OF FIDUCIARY DUTY CLAIM.

### A.  Jafrum's breach of fiduciary duty claim is time-barred.

There is no dispute that the breach of fiduciary duty claim alleged in this lawsuit is subject to the three-year statute of limitations. (Doc. 65, p. 18.)  However, unlike Jafrum's negligence claim, the Court concluded "that Jafrum's claims for breach of fiduciary duty began to accrue when it discovered, or ought to have discovered, **through reasonable diligence** that its insurance policies did not include coverage for trademark insurance," and that resolving this issue was "inappropriate for resolution on a motion for judgment on the pleadings."  (Id., p. 20.) (Emphasis added.)

"[W]here the evidence is clear and shows without conflict that the claimant had both the capacity and the opportunity to discover the mistake or discrepancy, but failed to do so, the absence of reasonable diligence is established as a matter of law." *Grubb Props. Inc. v. Simms*

PPAB 4135279v1

*Inv. Co.*, 101 N.C. App. 498, 501, 400 S.E.2d 85, 88 (1991).  The record evidence establishes that Jafrum had reasonable opportunity to discover its lack of trademark infringement coverage no later than March 21, 2011, for all relevant policies.

> **1.  The delivery of the 2011 Sentinel Policy triggered the accrual of the breach of fiduciary duty claim pertaining to the Sentinel Policies.**

As discussed above, Jafrum had in its possession the 2011 Sentinel Policy to read on March 21, 2011.  See, *supra*, section I(B).  Again, had Mr. Mohammed read the 2011 Sentinel Policy when it was delivered to him, he would have known that the 2011 Sentinel Policy unambiguously excluded trademark infringement coverage.  Id.

In a recent opinion, the North Carolina Court of Appeals addressed a closely-related fact pattern to the case at bar.  *Holmes v. Sheppard*, __ N.C. App. ___, 805 S.E.2d 371 (2017).  In *Holmes*, a landlord filed a lawsuit against his insurance agent for failing to procure a vacancy exclusion in an insurance policy for a residential property.  *Id*., at 375.  In his deposition, the plaintiff "repeatedly claimed" that he requested a vacancy exclusion by having "told [the agent] he did not want to have another issue because of vacancy," as he did after the insurer denied a prior claim based on the lack of such an exclusion.  *Id*.

The Court of Appeals held that the insurance agent was entitled to summary judgment on the plaintiff's negligent misrepresentation claim because the insured "could have discovered the truth that there was not a vacancy exclusion upon simple inquiry by reading the Policy.  [The plaintiff] repeatedly testified that he never read the Policy insuring the Property, despite receiving it in the mail. **Had he read the Policy, he would have learned that it did not include**

PPAB 4135279v1

**a vacancy exclusion.**" *Id*., at 376. (Emphasis added.)[5]

The statute of limitation analysis on the breach of fiduciary duty claim found *sub judice* is the identical legal standard to the negligent misrepresentation analysis contained in *Holmes* which affirmed summary judgment in favor of the agent—*i.e.*, that of reasonable inquiry charged upon the insured. An insured's failure to read a clear and unambiguous insurance policy is the classic example of the insured's failure to make reasonable inquiry.

Moreover, by simply reading the 2011 Sentinel Policy, a reasonably diligent individual would have also concluded that any **renewal** of that policy thereafter would exclude trademark infringement coverage. Jafrum did not inquire about, nor make further request for, the coverage between the 2011 Sentinel Policy effective date of March 12, 2011 and the Sentinel Renewal effective date of March 12, 2012. See, Exhibit A, 146:1-8; 146:25-147:15; 156:23-157:9; Exhibit D; and Exhibit G. Therefore, the accrual date for the statute of limitations for Jafrum's breach of fiduciary duty claim as to both the 2011 Sentinel Policy and the 2012 Sentinel Renewal is March 21, 2011. As Jafrum's Third Party Complaint against Charlotte Insurance was filed on November 18, 2014, the claim is time-barred as to the Sentinel Policies. (See, Doc. 3.)

### 2. Delivery of the 2011 Sentinel Policy also provided Jafrum with notice that the 2010 Catlin Policy lacked trademark infringement coverage.

Jafrum contends that it did not receive a copy of the 2010 Catlin Policy until after the commencement of this lawsuit by Catlin. See, Exhibit A, 115:12-116:11.

---

[5] While the Court affirmed summary judgment on the negligent misrepresentation claim, it reversed the grant of summary judgment on the negligence claim. The trial court concluded that the plaintiff, by failing to read the policy, was contributorily negligent as a matter of law. The Court of Appeals agreed, but reversed because there was sufficient forecast of evidence that the plaintiff-insured's failure to read the policy was induced by the defendant-agent's intentionally misleading statements. There is simply no similar forecast of evidence in the present case to preclude application of the contributory negligence doctrine at summary judgment, *supra* at Section I(B).

PPAB 4135279v1

Regardless, the breach of fiduciary duty claim as to the 2010 Catlin Policy is still time-barred because Jafrum should have discovered the absence of trademark infringement coverage in that policy, upon delivery of the 2011 Sentinel Policy.  In February 2011, after notice that the Catlin Policy would not be renewed, Mr. Mohammed made it clear to Charlotte Insurance that he wanted the same coverage as the Catlin Policy moving forward, for a less expensive rate.  <u>See</u>, Exhibit A, 132:6-8, and Exhibit D.  Mr. Mohammed understood that, in February 2011, Charlotte Insurance was procuring from Hartford/Sentinel the same coverage as was provided by Catlin, just at a cheaper price.  Therefore, had Mr. Mohammed read the 2011 Sentinel Policy, he would have realized that either (i) the terms, as he believed them to be, between the Catlin and Sentinel policies were not the same; or (ii) the terms, as he believed them to be, *were* the same between the two policies and Jafrum lacked trademark infringement coverage under both.  <u>See</u>, Exhibit A, 156:9-14.  At the very least, reasonable diligence on or around March 21, 2011 should have included a Jafrum inquiry as to whether the 2010 Catlin Policy also excluded trademark infringement coverage.[6]  That minimal inquiry did not occur and, thus, the breach of fiduciary duty claim is also time-barred as to the 2010 Catlin Policy.

Over a period of several years, Jafrum obfuscated its obligation to practice reasonable diligence in inquiring about its insurance coverages.  Based on Jafrum's opportunity to read the unambiguous terms of its 2011 Sentinel Policy, and its subsequent failure to conduct even a

---

[6] Nor were there any circumstances preventing Jafrum from requesting a copy of the 2010 Catlin Policy.  When the above-captioned matter was initiated by Catlin, Jafrum's attorney requested a copy of the 2010 Catlin Policy and that request was honored.  Exhibit A, 115:12-116:11.  There is record evidence that Mr. Mohammed doubted Mr. Keller's competence around the time the 2010 Catlin Policy became effective.  <u>See</u>, Exhibit A, 41:18-45:11.  Yet still, Mr. Mohammed chose not to make a reasonable inquiry when he did not receive a copy of the 2010 Catlin Policy.  Of course, even if he received the Catlin Policy upon its effectiveness in 2010, given his admitted custom of not thoroughly reading policies obtained on Jafrum's behalf, it likely would have made no difference at the time.

14

minimally reasonable inquiry on its own behalf, its breach of fiduciary duty claim against Charlotte Insurance accrued no later than March 21, 2011. As the Third-Party Complaint (Doc. 3) was filed on November 18, 2014, this claim must be dismissed as time-barred for all of the subject policies.

### B. Charlotte Insurance satisfied any fiduciary duty to procure the insurance Jafrum requested.

 "An insurance agent acts as a fiduciary with respect to procuring insurance for an insured, correctly naming the insured in the policy, and correctly advising the insured about the nature and extent of the coverage." *Phillips v. State Farm Mut. Auto. Ins. Co.*, 129 N.C. App. 111, 113, 497 S.E.2d 325, 327 (1998).

As discussed further *infra* at Section II(C), the general fiduciary duty of an insurance agent to an insured does **not** include a duty to advise. Nor does the fiduciary relationship include a duty "to affirmatively warn his customers of provisions contained in insurance policies." *Baggett*, 545 S.E.2d 462, 468.

Charlotte Insurance never affirmatively stated that trademark infringement coverage was excluded in any of the policies it obtained for Jafrum.  Indeed, Charlotte Insurance procured the coverage that Jafrum requested, and had no duty to extrapolate upon Jafrum's insurance needs based solely on Mr. Mohammed's description of issues related to his business.

### 1. Jafrum asked Charlotte Insurance to procure the same coverage he had with State Farm in years prior.

Prior to Charlotte Insurance, Jafrum obtained its CGL insurance for seven years through State Farm. See, Exhibit A, 72:12-73:17.  Jafrum paid annual premiums from $2000-$2300 for commercial general liability coverage that he believed included trademark infringement.  Id., 41:4-5; 56:17-18.  Mr. Mohammed insists that, in 2009-2010, before the 2010 Catlin Policy was

procured, he specifically requested that Charlotte Insurance procure trademark infringement insurance. <u>See, e.g.</u>, id., 41:5-11, 64:12-23, 147:21-148:1.

However, Mr. Mohammed also testified that he explained his claims history and what State Farm covered and expressed that he needed those types of claims to continue to be covered. Exhibit A, 42:19-23, 61:23-25, 131:18-24. Then, at the end of the Catlin policy year, he indicated he wanted Sentinel to provide the same coverage as Jafrum had with Catlin. Id., 131:8-132:8; 156:9-14. In fact, while he vacillated in his testimony on the issue of whether he ever specifically asked Charlotte Insurance to procure specific types of insurance, Mr. Mohammed was unequivocal in testifying that he explained Jafrum's prior claims history to Charlotte and Insurance and wanted insurance that covered the same things that State Farm had covered. Id., 97:22-98:25.

At summary judgment, the nonmoving party cannot create a genuine issue of material fact by contradicting himself in his own testimony. *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.") To that end, nor should the nonmoving party be allowed to elect the more favorable version of its own testimony so as to warrant a favorable inference by which to defeat summary judgment. Though muddled some by Mr. Mohammed, the record establishes that he asked Charlotte Insurance for the same coverage he had with State Farm, and that is precisely what Charlotte Insurance procured.

### 2. Mr. Mohammed's belief that the State Farm CGL policy provided Jafrum with trademark infringement coverage is mistaken.

Mr. Mohammed's belief that his State Farm policy had trademark infringement coverage is the mistaken premise from which his confusion over trademark infringement insurance

PPAB 4135279v1

Case 3:14-cv-00607-GCM-DCK    Document 75    Filed 02/27/18    Page 16 of 24

coverage begins.  This mistaken premise was compounded by his failure to read any insurance policies issued to Jafrum.  It is also related to Mr. Mohammed's misunderstanding as to the claims in a prior lawsuit that State Farm defended on Jafrum's behalf.

In order to explain the general contours of CGL policies and intellectual property insurance coverage, Charlotte Insurance obtained a declaration from an expert witness in the insurance and risk management industry.  <u>See</u>, Declaration of R. Bryan Tilden [hereinafter "<u>Exhibit H</u>"], ¶ 2.  In his report, Mr. Tilden explains that the 2009 State Farm Policy (Exhibit B) contained a clear and unambiguous exclusion for trademark infringement coverage, just like the subsequent Catlin Policy and the Sentinel Policies procured by Charlotte Insurance.  <u>See</u>, <u>Exhibit H</u>, Ex. 1, p. 11.  Under business liability exclusions, the 2009 State Farm policy excluded "advertising injury" "[a]rising out of the **infringement of** copyright, patent, **trademark**…" Exhibit B, p. 28 of policy; <u>see also</u>, Exhibit H, Ex. 1, p. 11. (Emphasis added.)

Why, then, did State Farm defend Jafrum in the trademark infringement lawsuit referenced by Mr. Mohammed?  Mr. Tilden provides an explanation, which the public court file in *Amcor Industries, Inc. v. Jafrum Int'l, Inc.*, confirms. <u>See</u>, 2:09-CV-9291 (C.D. Ca. 2009). According to Mr. Tilden, the lone insurance industry expert in this case, the *Amcor* lawsuit involved a linking claim. <u>See</u>, Exhibit H, Ex. 1, p. 13.  All the relevant policies—the 2009 State Farm Policy, the 2010 Catlin Policy, and the Sentinel Policies—contain "similar wording related to linking claims"—**which provides coverage**.  Id., Ex. 1, pp. 13-15.

Though the complaint in *Amcor* is styled as a "Complaint for Federal Trademark Infringement; State Trademark Infringement…" 2:09-CV-9291-CAS-PLA (Doc. 1, p. 1) (C.D. Ca. 2009), the factual allegations made against Jafrum clearly involve 'internet linking':

> Plaintiff is informed and believes, and on such basis alleges, that Defendant has advertised its goods using the GORILLA mark at trade shows in national magazines **and**

**on the Internet**, where consumers confuse its products with Plaintiff's products sold right alongside one another and in search results.

2:09-CV-9291-CAS-PLA (Doc. 1, p. 6, ¶ 14) (C.D. Ca. 2009). (Emphasis added.)

A covered activity was alleged in the *Amcor* lawsuit triggering State Farm's broad duty to defend. However, this covered activity was **not** trademark infringement. The same duty to defend would likely have arisen for Catlin and Sentinel had allegations of internet linking been made in the *Helmet Venture v. Jafrum* litigation underlying this action. However, as this Court held in its Order disposing of the declaratory judgment claims in this matter, "the Helmet Venture complaint does not allege any conduct by Jafrum that can be extricated from its trademark infringement allegations." (Doc. 65, p. 12.)

### 3. Charlotte Insurance procured increasingly inexpensive coverage at Jafrum's request.

As of January 26, 2011, Jafrum's emphasis in its charge to Charlotte Insurance was annual premium reduction. The year prior, Jafrum had paid a premium of $8,101.85 for the 2010 Catlin Policy. See, Mohammed Depo., Ex. 7 [hereinafter "Exhibit I"], at JAFRUM_000104. Despite knowing that Catlin was not renewing its policy for a second year due to its unwillingness to insure his products, and despite knowing that State Farm had previously refused to renew its coverage based on Jafrum's claim history, Mr. Mohammed sought "better insurance at a better price," with "all included." Exhibit A, 40:19-23, 129:1-21, Exhibit C.

In this same general period, Jafrum informed Charlotte Insurance that it was considering placing its logo on motorcycle helmets and to obtain quotes for general liability insurance with that information. See, Exhibit D. Mr. Keller testified that he had to approach the secondary—*i.e.*, "high risk"—market for this coverage on Jafrum's behalf. Keller Depo., 11:13-12:21. Three brokerages declined to even quote a price, "a couple of other specialty markets" declined as well, and one insurer—Evanston Insurance Company—provided a preliminary quote for an

18

annual premium of $25,000.  See, Exhibit E.  Mr. Keller dutifully shared this information with Mr. Mohammed the day he received it—on February 21, 2011—and explained to him that "branding motorcycle helmets" increased the cost of insurance significantly.  Id.  A mere twenty-one minutes after receiving Mr. Keller's email, Mr. Mohammed responded that Jafrum was abandoning its plans to brand motorcycle helmets.  Id.  "With this fact can we get Hartford [*i.e.*, Sentinel] or any other better insurance for a **low price**.  **I cannot afford anything more than [$]5000-[$]6000 at this time.**"  Id.  (Emphasis added.)  The 2011 Sentinel Policy was subsequently obtained by Charlotte Insurance with an annual premium of approximately $6,500, which Mr. Mohammed paid.  See, Exhibit A, 142:12-14.

Mr. Tilden, with over forty years of experience in the insurance industry, provides the only record evidence of how much trademark infringement coverage—if requested and procured—would have cost Jafrum in premiums.  See, Exhibit H, pp. 16-17.  Trademark infringement coverage would have been even more expensive than the general liability coverage quoted to Charlotte Insurance by the secondary marketplace when Jafrum considered branding the motorcycle helmets.  Recall that this is the same coverage that Jafrum declined on February 21, 2011 because the premium was too high.

According to Mr. Tilden, trademark infringement coverage costs "as much as **$50,000** [in annual premiums] for $1,000,000 of coverage," and "is a pretty lengthy underwriting process…" Exhibit H, Ex. 1, p. 16.  "These policies also contain a coinsurance provision, indicating that the insured will bear a stated percentage of each claim," ranging from 10%-25% of *each claim*.  Id., at p. 17.  Coverage for trademark infringement also contains a "per claim self-insured retention," with $25,000 per claim of self-retention being commonplace.  Id.

PPAB 4135279v1

Again, Mr. Mohammed stated to Mr. Keller that Jafrum could only afford $5,000-$6,000 in annual premiums as of 2011.  Exhibit E.  By its own admission, Jafrum could not have afforded trademark infringement coverage at the relevant time.[7]  Jafrum's instruction relating to premium reduction was consistently communicated to Charlotte Insurance, whereas Jafrum's undocumented 'instructions' related to trademark infringement are subject to various qualifications within Mr. Mohammed's testimony.  By procuring coverage from Catlin in 2010 similar to that of the coverage Jafrum enjoyed with State Farm from 2003-2009, and—at Jafrum's request—sustaining that coverage into the Sentinel Policies in 2011-2012, Charlotte Insurance satisfied its fiduciary duty to Jafrum.

### C. Charlotte Insurance did not have an 'implied duty to advise' Jafrum on its insurance needs.

It is unclear from the Second Amended Third-Party Complaint whether Jafrum contends that Charlotte Insurance owed, and breached, an 'implied duty to advise.'  Regardless, Charlotte Insurance owed no such duty to Jafrum because the requisite 'special relationship' between the parties did not exist.  See, *Cobb*, 715 S.E.2d 541, 548-49.

In *State Farm Fire & Cas. Co. v. Darsie*, the Court notes that there is a distinction under North Carolina law between "the general rights and obligations of parties to an insurance action," and those of the same in an elevated duty to advise.  161 N.C. App. 542, 550-51, 589 S.E.2d 391, 398-99 (2003).  In other words, not all insurance agents have a duty to advise their clients.  When the duty to advise does not exist, the insured's duty to read the policy is triggered,

---

[7] The evidence concerning Jafrum's rejection of the coverage, its stated budget for premiums, and its repeated requests to Charlotte Insurance to locate cheaper insurance is similar, though not identical, to the conduct of the plaintiff in *Phillips v. State Farm Auto. Ins. Co.*, 129 N.C. App. 111, 497 S.E.2d 325 (1998).  In that case, the Court affirmed a Rule 12(b)(6) dismissal, noting that "even had the plaintiff been so notified, it is entirely speculative whether he would have incurred the additional expense of increasing his liability limits… That is especially true in light of plaintiff's earlier rejection of UIM coverage."  497 S.E.2d 325, 327.

PPAB 4135279v1

and he is "held to be on notice of those terms in the policy which are otherwise clear and unambiguous." 589 S.E.2d 391, 399, <u>citing</u>, *Baggett v. Summerlin Ins. & Realty Inc.*, 143 N.C. App. 43, 545 S.E.2d 462 (2001), *rev'd per curiam*, 354 N.C. 347, 554 S.E.2d 336 (2001).

For an agent to have a duty to advise his clients, a so-called 'special relationship' must be present in one of three ways: "(1) the agent received consideration beyond mere payment of the premium; (2) the insured made a clear request for advice; or (3) there is a course of dealings over an extended period of time which would put an objectively reasonable insurance agent on notice that his advice was being sought and relied on." *Cobb*, 715 S.E.2d 541, 548.

There is no evidence that Jafrum paid Charlotte Insurance more than the annual premium for its various policies. Nor was there a request for advice by Jafrum to Charlotte Insurance related to trademark infringement coverage from the beginning of the parties' business relationship through the March 12, 2012 effective date of the Sentinel Renewal.[8] Mr. Mohammed did not ask questions about trademark insurance coverage—rather, he declared to Charlotte Insurance that "these are the issues… these are the legal cases… I told them all the stories. I told them we need full protection." Exhibit A, 98:10-15.

Finally, there was no "course of dealings over an extended period of time" that would have put Charlotte Insurance on constructive notice that its "advice was being sought and relied on." *Cobb*, 715 S.E.2d 541, 548. Courts applying North Carolina law as to this subject have

---

[8] The only even arguable request for advice from Jafrum to Charlotte Insurance occurred after the effective date of the 2012 Sentinel Renewal, when Mr. Mohammed contacted Pamela Kelly of Charlotte Insurance about renewal documents he had received. Exhibit A, 146:25-147:15, 148:8-17, Mohammed Depo. Ex. 13 [hereinafter "<u>Exhibit J</u>"]. The renewal documents reiterated the exclusion for infringement of intellectual property rights originally set forth in the 2011 Sentinel Policy. <u>Exhibit G</u>. Ms. Kelly responded by referring Mr. Mohammed to an attorney. She even provided him with contact information for one attorney in particular. Mr. Mohammed admits that he never contacted that, or any, attorney for advice on the renewal documents. Exhibit A, 152:5-155:5.

PPAB 4135279v1

required a business relationship of several years before an implied duty to advise arises. In *Bradley Freight Lines, Inc. v. Pope, Flynn & Co., Inc.*, the Court concluded that there was sufficient evidence of a course of dealings over "several years" such that the defendant-agent should have known his negligent advice was being relied upon. 42 N.C. App. 285, 287, 256 S.E.2d 522, 523 (1979). In *Fli-Back Co., Inc. v. Philadelphia Mfrs. Mut. Ins. Co.*, the forecast of evidence at summary judgment raised a "strong inference that [the agent] accepted a continuing obligation to advise [the insured] on its insurance needs" where the agent had been procuring insurance **for fourteen years when the relevant loss occurred**. 502 F.2d 214 (4th Cir. 1974).

More recently, in *Darsie*, the Court held that the factual record supported the trial court's conclusion that there was no special relationship so as to trigger the duty to advise. Those findings of fact included (i) a ten-year business relationship between the agent and the insured; (ii) the insured asked the agent for advice and followed that advice; (iii) the insured "had complete faith and trust" in the agent; and (iv) the insureds "relied on what [the agent] told and recommended to them about their insurance coverages." 589 S.E.2d 391, 399.

In this case, there is no evidence of a long-standing relationship between Charlotte Insurance and Jafrum, particularly at the time of the alleged breaches. After all, Jafrum has alleged that the first three insurance policies procured by Charlotte Insurance on its behalf failed to include the requested coverage. Indeed, the business relationship had only just begun when the Catlin Policy was procured in 2010. Moreover, Jafrum did not have "complete faith and trust" in its primary contact at Charlotte Insurance, from the beginning of the relationship. See, Exhibit A, 41:18-45:11. As such, no long-standing relationship of the kind found in *Bradley Freight Lines, Fli-Back Co.,* or *Darsie* exists so as to create a duty for Charlotte Insurance to advise Jafrum.

PPAB 4135279v1

Charlotte Insurance did not have an affirmative obligation to advise Jafrum after learning from Mr. Mohammed about Jafrum's business and its prior claims history. Accordingly, Charlotte Insurance is entitled to summary judgment on the breach of fiduciary duty claims.

## CONCLUSION

Based on the foregoing memorandum, Charlotte Insurance is entitled to summary judgment as to all the claims brought against it by Jafrum in the above-referenced action. As such, Charlotte Insurance respectfully requests that the Court grant its Motion for Summary Judgment.

This, the 27th day of February, 2018.

s/ Jason R. Benton
Jason R. Benton
N.C. State Bar #27710
PARKER POE ADAMS & BERNSTEIN LLP
Three Wells Fargo Center
401 South Tryon Street, Suite 3000
Charlotte, NC  28202
(704) 372-9000 (telephone)
jasonbenton@parkerpoe.com

s/ Daniel E. Peterson
Daniel E. Peterson
N.C. State Bar #41521
PARKER POE ADAMS & BERNSTEIN LLP
Three Wells Fargo Center
401 South Tryon Street, Suite 3000
Charlotte, NC  28202
(704) 372-9000 (telephone)
danielpeterson@parkerpoe.com

*Counsel for Third-Party Defendant Consolidated Marketing Group, Inc. d/b/a Charlotte Insurance*

23

<strong><u>CERTIFICATE OF SERVICE</u></strong>

The undersigned hereby certifies that the foregoing **Brief in Support of Third-Party Defendant Consolidated Marketing Group, Inc. d/b/a Charlotte Insurance's Motion for Summary Judgment** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing and serve same upon counsel of record via the Court's electronic case filing system, as follows:

> R. Steven DeGeorge, Esq.
> ROBINSON BRADSHAW & HINSON, PA
> sdegeorge@rbh.com
> *Counsel for Jafrum International, Inc.*
>
> Gregory W. Brown, Esq.
> Justin Matthew Osborn, Esq.
> Matthew R. Gambale, Esq.
> Brown Law LLP
> gregory@brownlawllp.com
> justin@brownlawllp.com
> gamballe@brownlawllp.com
> *Counsel for Catlin Specialty Insurance Company*
>
> Douglas W. Hanna, Esq.
> Graebe Hanna & Sullivan, PLLC
> dhanna@ghslawfirm.com
> *Counsel for Sentinel Insurance Company*

This 27th day of February, 2018.

> s/ Jason R. Benton
> Jason R. Benton
> N.C. State Bar #27710
> PARKER POE ADAMS & BERNSTEIN LLP
> Three Wells Fargo Center, Suite 3000
> 401 South Tryon Street
> Charlotte, NC  28202
> Telephone:  704-372-9000
> Facsimile:  704-334-4709
> jasonbenton@parkerpoe.com

24